I3GPHEAO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  IN RE:  HEARTWARE
   INTERNATIONAL, INC.
4  SECURITIES LITIGATION,
                                        16 CV 0520 (RA)
5  ------------------------------x

6

7                                       New York, N.Y.
                                        March 16, 2018
8                                       11:06 a.m.

9  Before:

10                     HON. RONNIE ABRAMS,

11                                         District Judge

12                        APPEARANCES

13 BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
        Attorneys for Plaintiffs
14 BY:  JOHN RIZIO-HAMILTON, ESQ.
        ABE ALEXANDER, ESQ.
15
   WILMER CUTLER PICKERING HALE & DORR LLP
16      Attorneys for Defendants
   BY:  JEREMY T. ADLER, ESQ.
17      MICHAEL G. BONGIORNO, ESQ.

18

19

20

21

22

23

24

25

1           (In open court)

2           (Case called)

3           MR. RIZIO-HAMILTON:  Good morning, your Honor.  John

4    Rizio-Hamilton from Bernstein Litowitz Berger & Grossmann for

5    the lead plaintiff.

6           MR. ALEXANDER:  Good morning, your Honor.  Abe

7    Alexander, Bernstein Litowitz, for the plaintiff.

8           THE COURT:  All right.  Good morning.

9           MR. ADLER:  Good morning, your Honor, Jeremy Adler

10   from Wilmer Hale.

11          MR. BONGIORNO:  Mike Bongiorno from Wilmer Hale for

12   the defendant trusts.

13          THE COURT:  All right.  Good morning.  We're here to

14   discuss defendant's motion to dismiss.  I'm happy to hear you

15   out.

16          MR. BONGIORNO:  Sure, your Honor.

17          THE COURT:  I'm just going to ask you to bring the

18   microphone close to where you're standing.  Thank you.

19          MR. BONGIORNO:  That's about as close as I can get it,

20   I think.

21          THE COURT:  Go ahead.

22          MR. BONGIORNO:  So, your Honor, for the defendants, we

23   represent HeartWare and Mr. Godshall, who was the CEO of

24   HeartWare, which was a small medical device company in

25   Framingham, Massachusetts, with the facility -- manufacturing

1  facility down in Florida, since acquired by a larger company,

2  but at the time, that's what it was.

3       THE COURT:  I've, of course, read all the briefs,

4  which, by the way, I thought were excellent.  But I'm happy to

5  hear you out.

6       MR. BONGIORNO:  Okay, your Honor.  I'll skip all the

7  background then and jump right into what I think are a few

8  important points.  I think the heart of the issue here, there

9  are two things, one is falsity and the other is scienter.  On

10 both points, I think where the complaint falls down is its

11 reliance on ex-employees who don't say anything close to what

12 the plaintiffs would like them to have said, the way they

13 characterize them elsewhere in the complaint, other than when

14 they're focusing on the ex-employees themselves, and most

15 certainly in the opposition brief.

16      Because the theory, apparently, is that HeartWare

17 plowed forward with this trial on MVAD, knowing that it was

18 going to fail.  And the theory behind that, of course, is that

19 HeartWare got a warning letter from the FDA, which dealt with

20 certain processes, validation, documentation, all of which

21 related to a different product that was already on the market,

22 the HVAD product.

23      The HVAD product had been on the market for a while,

24 was a fairly successful product.  There was some competition

25 out there.  HeartWare was developing a new product, a smaller

1    version of the same pump, or a similar pump and was trying to

2    get that into clinical testing.

3         The class period here -- and we've all seen a lot of

4    these cases because whenever there's a bump in the road in the

5    FDA process and the stock price goes down, we see a case like

6    this.  So in a lot of these cases, the class period starts with

7    some fairly spectacular announcement about some great results

8    of a clinical trial or something wonderful.

9         Here, the class period starts kind of with a thud.  I

10   think it's June 10th of 2014, where the CEO of HeartWare isn't

11   talking about something wonderful.  He's actually talking about

12   the warning letter, and in the warning letter he says, gosh, I

13   got one of these in my other company and it just killed us.  It

14   was years, it took forever, et cetera, going to try to do

15   better this time.  And then he couches it with all sorts of

16   cautionary language about, you know, the problems that might

17   arise but they're going to throw resources at it.

18        The plaintiffs don't dispute that the company threw

19   resources at it.  They just say we didn't do a good job.  We

20   disclosed millions of dollars that we've spent, in various

21   orders.  There is $10 millions worth of spending.  The

22   plaintiffs dispute.  They admit the amount.  They just say, we

23   don't know what it was spent on, and we have these ex-employees

24   who say things were messed up, and they weren't doing a good

25   job, and they were ignoring problems and, therefore --

1          THE COURT:  They also say that misstatements were made

2    about what kind of progress was with being made, if any, among

3    other things.

4          MR. BONGIORNO:  They most certainly say that, your

5    Honor, but they don't have the allegations to back that up.

6    They rely on folks who had either no contact with Mr. Godshall,

7    or didn't even work there during the class period, or both.

8          So the big, lengthy explanation of their basis for a

9    lot of this comes from Former Employee No. 1.  Former Employee

10   No. 1 did not work at the company during the class period.  So

11   employee -- Former Employee No. 1 says there was this problem,

12   there was this problem, there were meetings, people definitely

13   knew, which I think is code for they must have known but I

14   don't really know but I'm assuming it.

15         There's only one person who claims to have had one

16   interaction with Godshall, and that's Former Employee No. 1,

17   who didn't work there during the class period.

18         THE COURT:  What about Former Employee No. 5?  For

19   example, one of the allegations is that on October 30th, 2014,

20   on a third-quarter earnings call, Godshall stated that we've

21   made significant progress in our efforts to address the FDA

22   warning letter issues and that we've upgraded many of our key

23   procedures and are already seeing a positive impact from the

24   new approach.

25         According to Former Employee 5, who was allegedly a

1  validation and verification tester from August 2012 to

2  March 2015 and who worked on MVAD, including its controller,

3  after receiving the warning letter, the manufacturing testing

4  and validation process at HeartWare -- and this is a quote

5  now -- didn't change, rather, "we were just doing exactly what

6  we were doing before receiving the letter."

7       Why is that not a sufficient allegation of a false

8  statement?

9       MR. BONGIORNO:  Well, a couple of things, your Honor.

10  First of all, again, no contact with Godshall; so on the

11  scienter piece, I don't know how you get to scienter.  But I

12  know your Honor's question addressed falsity; so let me address

13  falsity.

14       The statement that your Honor just quoted, I don't

15  think is a statement on which a securities fraud claim can be

16  based.  It's a pretty general statement about optimism about

17  what's going on and what they're doing at the company.

18       The complaints that he has, he or she has, Former

19  Employee No. 5, have to do with the suction alarm being

20  defective.  They were triggered in extreme conditions and the

21  impeller was, however you say that word, was insufficiently

22  tested as of March of '15.

23       So the first implant of this device isn't until, I

24  think, five months after that.  So exactly what was going on at

25  the time this person left versus what was going on months

1  later, when the device was first implanted, this person

2  certainly can't speak to.  What Godshall knew about that, this

3  person certainly can't speak to.

4        One of the things that this person claims about is

5  that the battery could be charged up to 99 percent; so

6  HeartWare lowered it to 97 percent, the threshold for saying

7  the battery is fully charged.  That's one of the specific

8  things that Former Employee No. 5 says.  Hard to believe that

9  it is securities fraud for Godshall to say, things are going

10  well and progressing in terms of responding to the warning

11  letter, which again had to do with the HVAD processes, but I

12  understand your Honor's point, which is processes are

13  processes.

14        THE COURT:  If he's saying, we made significant

15  progress and that we've upgraded many of our key procedures --

16  and I'm, obviously, not weighing it on merits, of course -- but

17  if, in fact, it turns out to be true that they hadn't made any

18  progress and/or upgraded any of the key procedures, why is that

19  not a material misstatement?

20        MR. BONGIORNO:  Well, first of all, I do think it's

21  too general for it to be a statement on which a potential

22  purchaser of the stock can rely.  I think that's corporate

23  optimism and that's puffing and that's a non-material statement

24  in the first place.  So it can't be a material misstatement if

25  it's not material in the first place.

1        But Former Employee No. 5 certainly can't speak to

2    that general a statement and say it's not true because of

3    his -- his or her narrow window into certain validation

4    processes in general at the company.

5        For Godshall to say we've made significant progress

6    could absolutely be true, regardless of what this person says

7    or saw.  It is undoubtedly the case --

8        THE COURT:  Is it not plausible that it's true, that

9    he was right?

10        MR. BONGIORNO:  I don't think that's the standard,

11    your Honor, for deciding whether or not -- whether or not a

12    statement is true or not based on a former employee's limited,

13    narrow explanation of what he or she saw.

14        Is the allegation plausibly true based solely on one

15    employee's observation of a couple of validation tests?  No.

16    That's not enough for a fraud claim, and it's certainly,

17    certainly, and I understand your Honor didn't ask this

18    question, but it's certainly not enough for scienter, which is

19    a critical piece of our motion.

20        If you put together, you know, all six former

21    employees, I still don't think you add up to a plausible claim

22    that something specific that Godshall said was false or

23    misleading when it was made because, again, I think much of

24    what he said is just general types of corporate optimism, we're

25    on track, we're doing well, we're making progress, that type of

I3GPHEAO

1    stuff.

2         We've cited dozens -- well, maybe not dozens, but we

3    cited as many cases we thought were appropriate on the point

4    that those types of statements are not statements on which a

5    securities fraud claim can be based.

6         Putting that aside, whether or not you think that's a

7    statement of the Court -- I apologize, the Court thinks that a

8    statement can be relied upon by an investor, I don't think

9    there is enough here from the former employees to say that

10   anything specific that Godshall said was false when it was made

11   and certainly, certainly there's not enough for scienter,

12   regardless of what anyone thinks about the falsity or lack

13   thereof of the sufficiency of the pleadings on that point.

14        So I think that's sort of the heart and soul of our

15   motion, and the heart and soul of what the infirmities are with

16   the case because, obviously, we could go one by one through

17   these employees, but I know the Court is familiar with them and

18   is focusing on what the Court would like to understand better.

19        But for each employee, there are gaps, there are

20   holes, and there's nothing that takes what the employee said

21   and what the employee saw and contrasts it with what was

22   actually happening to the point where you could say that there

23   was a false or misleading statement.

24        You know, there's stuff about things like the qPulse

25   algorithm and supposed infirmities with that.  But if you

1  compare what they say in the beginning of the complaint in

2  paragraph 16 about somebody observed it, and they spoke to

3  Godshall about it, and you go to the actual employees'

4  statement in the complaint -- which I think are later, in the

5  80s and 90s paragraphs, in the complaint -- and you look at

6  what the employee actually said and you try to figure out, when

7  did this person work here?  What did they do?

8          Oh, this person was just a software engineer, and they

9  are trying to tell the Court that the red blood cells or the

10  blood cells were being ground by the impeller and that could

11  create thrombosis.  What does a computer programmer software

12  programmer doing trying to tell us that?  That's not a doctor.

13  That's not a scientist.  That's a software engineer.  And that

14  statement is really not even attributed to anyone.  It's just

15  in the complaint in the section about the employees.  I assume

16  the employee must have told the private investigators for our

17  plaintiffs that statement, but they have no basis to say that.

18          They can't possibly know something like that.  That's

19  somebody who is a lot smarter than I am in an area that I don't

20  understand, but it's computer software programming associated

21  with getting the device to do things.  It's not diagnosing what

22  about this device, if it goes wrong, could cause thrombosis.

23  The person who's writing code has no idea about that.

24          What they do have an idea about is what happened,

25  which is, unfortunately, this device was implanted in folks

1   over in Europe, and it didn't work the way we wanted it to.

2   There's no doubt about that, and there were thrombosis events,

3   and that is not a good thing.  And we stopped the trial when we

4   figured that out.

5           But a software programmer, who's saying, oh, the

6   impeller is grinding the blood cells, whatever?  They can't

7   tell us that they knew, in 2014, that that problem with the

8   software was going to cause this issue in these patients.  Of

9   course, we didn't put this device into patients if we thought

10  it was going to do that.

11          And what you don't see in the complaint, which would

12  be a problem, and I'm sure the Court may be wondering, okay,

13  Mr. Bongiorno, what is it these employees could have told us

14  that would have made what Godshall said false?  And the answer

15  to that question is pretty simple.  He said, we can't get this

16  device to create thrombosis in bench testing, and so we think

17  it's going to have a lower thrombosis rate when all is said and

18  done.  We think this is a great device.  And you don't see a

19  single person put in this complaint that's a lie.  There were

20  thrombotic events in the bench testing.  That happened.  They

21  didn't want you to know that; so they didn't tell you that, and

22  they told you the exact opposite.

23          I can see that, if that's in there, that's a different

24  issue.  What do are we doing telling people that this didn't

25  happen when it did?  Contemporaneous knowledge of falsity,

1   that's what's missing.  It's missing from the falsity element

2   and it's missing from the scienter element.  I think that's

3   really the key to our motion, your Honor.

4           THE COURT:  All right.  Thank you very much.

5           Yes, hi.

6           MR. RIZIO-HAMILTON:  Good morning, your Honor.

7           THE COURT:  Good morning.

8           MR. RIZIO-HAMILTON:  I'll try and be brief and just

9   address some of the points that my colleague mentioned.

10          THE COURT:  Why don't you respond to the argument that

11  these are just statements reflecting corporate optimism,

12  they're forward looking, they're opinions.

13          MR. RIZIO-HAMILTON:  Sure.  So the statements at issue

14  in this case are factual representations, at their core, about

15  two things principally.  One is the current status, progress

16  and success of the company's remediation efforts; and two, is

17  the current safety profile of the device which is, in fact, you

18  know, derived from the supposedly rigorous testing that the

19  company has undertaken.

20          So, for instance, there are statements such as, we

21  have, quote, made significant progress in our effort to address

22  the FDA warning letter.  We have upgraded many of our key

23  procedures and are already seeing a positive impact from the

24  new approach.

25          That kind of statement is factual, and it is certainly

1    present tense, and there are many, many others of that ilk in

2    the complaint.  For instance, you know, later in the class

3    period, defendant Godshall states that HeartWare has, quote,

4    totally overhauled our R and D procedures.  He states that

5    HeartWare is really tight now in terms of open issues that

6    could have resulted in challenges from regulators.

7         So there's a variety of statements in the complaint,

8    your Honor, and we submit that the overwhelming majority are

9    present tense, they are factual and they are highly material to

10   investors and that, in fact, have been held actionable by

11   courts in the other cases we cite in our brief, like the

12   *Mulligan* case is one example, but there are others in the

13   brief.  I won't go through them chapter and verse.  I don't

14   think there's any need.  The Court is familiar with them.

15        But I do want to underscore the materiality in these

16   statements because a lot of what my colleague was saying was,

17   sort of, meant to make the point that the statements are not of

18   a nature that an investor would consider significant.  Nothing

19   could be further from the true.  The fact of the matter is that

20   the status of the company's remediation efforts and its success

21   in those efforts was first and foremost on the mind of

22   investors.

23        Defendant Godshall himself stated that remediating the

24   warning letter was the company's top priority.  Analysts, on

25   conference call, after conference call, repeatedly asked

1   defendant Godshall about the status of the company's

2   remediation efforts.  And in their reports recommending

3   HeartWare stocks, analysts repeatedly relied on Godshall's

4   statements and, in fact, often repeated them in those reports

5   to the market at large.

6           So I think that all those facts, kind of taken

7   together, demonstrate the materiality of the statements.  And

8   in similar circumstances, other courts have agreed.

9           Also supporting materiality is the fact that, you

10  know, defendant Godshall repeatedly said that their success in

11  remediating the warning letter very much implicated MVAD and

12  that MVAD was the company's No. 2 priority and was, in fact,

13  the key to reigniting HeartWare's stalled road.  The

14  remediation efforts themselves and their implications for the

15  company's ability to implant MVAD in humans and ultimately

16  bring it to market, further underscores the materiality of

17  those particular remediation statements.

18          As far as the safety profile statements, and

19  particularly the statements relating to the propensity of the

20  device to cause pump thrombosis, those were of utmost

21  importance to the market.  There was, in fact, early studies of

22  VAD devices that showed about a two to four percent thrombosis

23  rate, fueled market optimism and market growth.

24          As we allege in the complaint, at the start of the

25  class period, there was a New England Journal of Medicine

1    article that was published showing an 8 percent thrombosis rate

2    for, I believe, HeartMate II, which was HVAD's principal

3    competing device, and that actually caused market contractions.

4    And analysts specifically reported that that was a major

5    challenge for the industry to overcome if it wanted to be

6    growing again.

7            And so analysts and investors were intensely focused

8    on safety profile statements, particularly if those statements

9    concerned the device's propensity to thrombus.  And those are

10   precisely the kind of safety statements at issues here.

11           THE COURT:  Do you want to respond to Mr. Bongiorno's

12   argument regarding scienter?

13           MR. RIZIO-HAMILTON:  Yes, your Honor.

14           So we think that there are ample facts in the

15   complaint that give rise to an inference of scienter that are

16   at least as strong as the opposing inference.  First of all,

17   with respect to defendant's statements that the adverse events

18   that they had observed in the CE Mark trial, which they did not

19   disclose at all until market rumors swirled and required them

20   to speak, they said they were typical of those observed in

21   other studies.

22           But at the time the defendants made that statement,

23   there's no dispute that they were in possession of data showing

24   that the patients in the CE Mark trial were thrombosing at a

25   rate that was vastly in excess of prior rates that had fueled

1    market optimism and even vastly in excess of the 8 percent rate

2    for HeartMate II that had fueled market concern.

3            So the fact that defendants were in possession of that

4    data at the time that they assured the market, and those

5    statements were reassuring statements, intended as such, the

6    fact that defendants were in possession of that data at the

7    time when they reassured the market as they did is compelling

8    evidence of scienter.  That's point one.

9            Point two, throughout, defendant Godshall was

10   repeatedly kept apprised of the facts concerning, A, the lack

11   of remediation efforts at HeartWare; and, B, the fact that the

12   testing that they did perform showed serious safety defects,

13   including the defects that ultimately materialized in the CE

14   Mark trial.

15           Former Employee 1 reported that defendant Godshall

16   usually attended the monthly program board oversight -- project

17   board oversight meetings, where the defects with the qPulse,

18   with the suction alarm and the controller were discussed.

19   There were weekly MVAD team meetings that defendant Godshall's

20   direct reports attended, Mr. LaRose and Mr. Strong, where these

21   same defects were reported.

22           And following these meetings, minutes were prepared

23   reporting the defects that were distributed to defendant

24   Godshall and many other senior executives at the company.

25   That's point two.  Defendant Godshall, there was a steady

1   stream of information directly to defendant Godshall about

2   these defects at the time he made his statements and the state

3   of the company's remediation efforts.  That's point two.

4           Point three, defendant Godshall, himself, said that he

5   was paying close personal attention to these very issues.

6   Again, remediating the warning letter was the company's top

7   priority, and MVAD was its second-most important priority.  And

8   defendant Godshall repeatedly stated that he was paying close

9   personal attention on both scores.  And so his statements very

10  much bolster and corroborate the report of Former Employer 1,

11  that he was, in fact, being informed.  That's point three.

12          Point four, defendant Godshall was speaking about

13  issues that were, as I've noted, the most significant ones

14  facing the company.  This is, in essence, a core operations

15  argument, and whatever one may think about the viability of the

16  core operations doctrine as an independent basis for proving

17  scienter, that's kind of by the wayside here because we're not

18  simply relying on the core operations doctrine.

19          The case law is to the effect that core operations

20  allegations, such as those that we have here, do indeed bolster

21  the inference of scienter when there is additional evidence

22  showing that defendants had access to information contradicting

23  their statements, such as the case here as I've noted.  The

24  importance of the remediation efforts and the importance of

25  MVAD to HeartWare's business are indeed supplementary evidence

1   of scienter.

2           And, finally, your Honor, we believe that the

3   Valtech -- the Valtech transaction is additional scienter

4   evidence.  When this transaction was announced, to say the

5   market was perplexed is an understatement.  No one understood

6   why, if the company was, in fact, so bullish about MVAD, with

7   approval potentially just months away, it would agree to give

8   up about a third of the value of its equity in exchange for a

9   company in a completely other line of business when, should the

10  approval be granted as defendants said they were confident, the

11  value of that equity would increase dramatically in the near

12  term.

13          And, in fact, Wells Fargo analysts said that the

14  announcement of that transaction really makes us doubtful.  It

15  calls into question whether defendant Godshall is truly bullish

16  on MVAD, as he's repeatedly said.  And indeed, the company's

17  largest shareholder, frankly, said that when transformative

18  corporate acquisitions like this are announced, it often leads

19  one to question management's faith in the company's core

20  business.

21          Such an acquisition, like Valtech, could only be

22  approved and consummated with the knowledge of the company's

23  highest executive, like defendant Godshall.  So to the extent

24  that the Valtech transaction was motivated by a desire to hedge

25  MVAD precisely because defendant Godshall was deeply concerned

1    about the device, that too supports an inference of scienter.

2          The timing of that transaction bolsters the inference

3    because the transaction was announced on September 1st, 2015.

4    The market said, this makes us think you're really worried

5    about MVAD.  And, in fact, one week later, the company pauses,

6    literally one week later, the company pauses the CE Mark trial

7    because the controller is literally falling apart.  Just seven

8    weeks after the trial started and one week after Valtech is

9    announced, the company says, we have to pause, the controller

10   is falling apart, physically.

11         Then, a month after that, about a month-and-a-half

12   after Valtech is announced, the rumors begin swirling about

13   adverse events and defendants, you know, falsely reassured the

14   market in response, with the trial still paused, and then soon

15   thereafter, in January, the company is forced to announce that

16   approximately half the patients have suffered these very severe

17   thrombotic events that the market was intensely concerned

18   about.

19         So, you know, the timing of that transaction and the

20   subsequent events further bolster the inference that it was

21   undertaken because management was, contrary to its public

22   statements, actually quite concerned about the device.

23         THE COURT:  Finally, why don't you address briefly

24   loss causation and why the stock decline was in reaction to the

25   allegedly false statements as opposed to, you know, the spate

1  of bad fortune relating to the development of this innovative

2  project.

3      MR. RIZIO-HAMILTON:  Sure.  So, you know, as your

4  Honor is well aware, loss causation is subject to only rule 8

5  notice pleading, and it is typically an issue for expert and

6  fact evidence at trial, and generally shouldn't be decided at

7  the pleading stage.

8      We think that the complaint here contains many

9  allegations that adequately allege loss causation, at a

10  minimum, under rule 8.  So the sort of core of defendant's

11  statements obscured from the market the truth that the

12  company's processes hadn't been sufficiently remediated, and

13  the risk that the device had not been adequately tested and, in

14  fact, had a safety profile that was significantly more

15  dangerous than the market had been led to believe.  That's kind

16  of the sort of risk that was obscured and hidden by defendant's

17  statements.

18      The disclosive events each constituted a

19  materialization of that hidden risk.  The first is the

20  September 1st announcement of the Valtech transaction, and

21  defendants say, you know, a corporate transaction can't reveal

22  a risk that the device is deeply flawed and dangerous.  The

23  problem is that here -- or the problem in their argument is

24  here we have very specific market reactions saying almost

25  exactly that, because the Wells Fargo analysts said that this

1   transaction reveals to us that the company isn't as bullish on

2   MVAD as it has led on, which caused very serious market concern

3   about the device, and they said that that was, in fact, the

4   most common question they got from investors.

5           So we have very detailed facts demonstrating that the

6   announcement of the transaction revealed to the market the risk

7   that the device was not as represented and that management's

8   confidence in it was not as represented.  And, indeed, this was

9   confirmed by the fact that in the weeks following the

10  announcement of that transaction, defendant Godshall went on

11  essentially a PR campaign to reassure the market that that was

12  not the case.

13          He specifically acknowledges that the market took that

14  from the announcement of the transaction, took that from the

15  disclosive event and tells the market that there's nothing to

16  worry about, which was not true.  So that's the theory for

17  disclosure one.

18          The second and third disclosures on October 12th and

19  then later in January 2016, both confirmed the disclosure of,

20  in the case of the October event, potentially adverse events

21  that had been experienced in the trial; and then in January,

22  the confirmation that those adverse events had, in fact,

23  occurred and it affected almost 50 percent of the patients that

24  had been implanted with the device.

25          In both cases, the disclosure of the adverse events is

1   a materialization of the risk that the company had not

2   thoroughly tested the device, did not have a handle on its true

3   safety, and that the device was, in fact, materially more

4   dangerous than had been represented.  That is within the zone

5   of risk concealed by defendant's misstatements and, therefore,

6   satisfies the standards for pleading loss causation most

7   recently articulated in by the Second Circuit in the Vivendi

8   decision.

9           THE COURT:  All right.  Thank you.  Do you want to

10  respond briefly?

11          MR. BONGIORNO:  Yes, your Honor.  Thank you.  Let me

12  focus on the scienter piece because my colleague spent a lot of

13  time on that.

14          I think he gave you five reasons.  They don't add up.

15  The first one, when the Court asked about scienter, he said

16  adverse events in the CE Mark trial, patients vastly in excess

17  of -- thrombosing vastly in excess of other products, similar

18  products.  First of all, that's in late 2015 for a class period

19  that starts in June of 2014.  Hard to base scienter on our

20  knowledge of adverse events in a trial that started in late

21  2015 for a class period that starts well over a year before.

22          The theory, apparently, is that we acted with scienter

23  because we didn't disclose the number of thrombotic events at

24  the time we disclosed that there were adverse events in the

25  trial that were typical of this type of device.

1          But what's left out of that equation?  I don't know

2    how that's a scienter argument because, again, that's over a

3    year into the class period.  How that shows that they're acting

4    with scienter over a year earlier, I don't know, but in terms

5    of the falsity of that statement in the first place, which he's

6    saying shows scienter because Godshall knew how many adverse

7    events there were and he didn't say how many adverse events

8    there were.  He said he wasn't going to reveal the number of

9    adverse events.

10          Hard to base a securities fraud claim on a question

11   that somebody says they're not going to answer.  How is it

12   fraud when someone says, how many?  And you say, I don't think

13   it's responsible for me to say right now.  We're at the very

14   beginning of the trial.  That is not securities fraud.  That's

15   a question that he didn't answer.

16          Second of all, the market understood what was going

17   on.  He used the plural, the analysts' reports that he likes to

18   rely on to say here's what the market understood what's

19   happening, said there was a cluster of thrombotic events.

20   That's a whole lot more than one.  There were only three.

21   There were only 11 patients enrolled at that point and, again,

22   that's a class period that shouldn't exist at all, but if it

23   does, starts in October of 2015, not June of 2014.

24          His second point on scienter, he said, we cite in the

25   complaint that Godshall was repeatedly apprised of the lack of

I3GPHEAO

1    remediation efforts throughout the class period.  That is not

2    what the complaint says.  The complaint says no such thing.

3         What did he mention?  He mentioned Former Employee

4    No. 1.  Throughout the class period, he wasn't even there -- he

5    or she wasn't even there during the class period.  So Former

6    Employee No. 1 doesn't get you anywhere.

7         Weekly meetings attended by Godshall's direct reports.

8    That's not Godshall being apprised.  That's his direct reports

9    maybe being apprised, I don't know, but it's certainly not him.

10        He says minutes of these meetings reporting the

11   defects were distributed.  The complaint doesn't say that.  The

12   complaint doesn't say anything about what's in those meeting

13   minutes.  It says minutes were kept of the meetings, and they

14   were distributed.  Did any of these former employees see those

15   meeting minutes?  Do they know what they said?  Do they know

16   whether or not it went to Godshall?  Do they know if he read

17   them?  Did it happen during the class period?  We don't know

18   the answer to any of those questions.

19        Third scienter point, he was paying attention, and he

20   was the CEO and it was important.  We don't dispute that he was

21   paying attention.  What we dispute is what he learned by paying

22   attention because there's --

23        THE COURT:  This was a relatively small company; am I

24   right?

25        MR. BONGIORNO:  It is certainly smaller than it is

1  now.  I mean, now it's part of Medtronic.  At the time, there

2  were hundreds of employees.  Now, there are many thousands.

3  But a lot of what's going on in the complaint is happening in

4  Florida, not in Framingham, Massachusetts.  It's not a

5  mom-and-pop corporation.  It was a publicly traded company with

6  lots of employees, scientists, computer software programmers.

7  They were doing all their own work in-house.

8      This was not -- it was a mid-sized company.  I

9  wouldn't call it a small company, relatively speaking, but I

10  understand the Court's point, which is, you know, he's the CEO,

11  he's speaking on it, he must know something about what's going

12  on and, of course, he did.  We're not saying he wasn't paying

13  attention, he was asleep at the wheel or anything like that,

14  but there are lots and lots of employees at this company doing

15  lots of things.  And they're developing a device.

16      The notion that the device is going to be perfect on

17  day one and that the display is not going to blink and that the

18  display is not going to go blank and there aren't going to be

19  gibberish notes shown on the display on day one, is ridiculous.

20  Of course those things happen.  Of course they happen.  It

21  overheats.  It goes to 99 instead of 97.  Of course that

22  happens.

23      It happens to, you know, Apple developing an iPhone.

24  It happens all the time.  But for people to come in, two years

25  later and say, boy, I was at the company -- the phrase they

1    like to use is, even before the class period.  Not even before

2    the class period, only before the class period.  This person

3    wasn't there during the class period.

4         Sure, you saw those things.  Of course you did.  It's

5    very easy to come back three years later, when something goes

6    wrong and very unfortunate events take place, and say, I knew

7    it all along.  I knew that device was never going to work.  I

8    kept having problem, after problem with it.  Of course you did.

9    If these were easy to develop, everyone would do it.  It's a

10   lot of work that's very hard.

11        Was he optimistic?  Yes.  Did he display his optimism?

12   Yes.  Every time he spoke, were those not couched with anything

13   could happen, knock on wood, we'll see.  At one point, he says,

14   the FDA might show up in three months, and if they do, maybe

15   they'll find something, maybe they won't.  I don't know.  But

16   if they do, we'll be wanting to fix it immediately.

17        And the plaintiffs say, that's false.  Really?  That's

18   false?  The FDA might show up in three months, and I don't know

19   what's going to happen if they do and if they find something, I

20   want to fix it, how is that false?  Of course they're going to

21   fix it.  But that's the case we have here, lots of ex-employees

22   saying I saw this, I saw that.  Of course you did.  That's not

23   a fraud claim.  It certainly doesn't reach the level of

24   scienter.

25        The core operations theory is not a viable theory, and

I3GPHEAO

1    it's certainly not a standalone theory.  I just went through

2    one through four and core operations was five, I believe --

3    actually, sorry, core operations was four.  Five was Valtech.

4    We cited to the Gentiva case on that point.  The Valtech

5    transaction cannot support an inference of scienter.  It

6    certainly cannot support an inference of scienter 13, 14 months

7    before it was entered into.  Again, most of what you heard

8    about scienter was problems with the CE Mark trial, which

9    didn't start until late 2015.  That cannot support scienter for

10   this class period.

11             THE COURT:  All right.  Thank you.

12             MR. ADLER:  Thank you.

13             THE COURT:  Why don't we adjourn for a few minutes,

14   and then resume our proceedings.  Thank you.

15             (Recess)

16             THE COURT:  Be seated.  I am prepared to rule, and in

17   the interest of moving the case along, I'm going to rule orally

18   today.  You can, of course, obtain a transcript of today's

19   proceeding.

20             In short, Defendants' motion is denied.  I think

21   Plaintiff has adequately pled its claims.  I'm going to assume

22   the parties' familiarity with the facts alleged in the

23   Complaint, which are construed in the light most favorable to

24   Plaintiff.  See *Kleinman v. Elan Corp.*, 706 F.3d at 152.

25             The motion to dismiss standard is familiar.  Plaintiff

must state enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570. A claim has facial plausibility when it contains factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678.

Claims alleging securities fraud, moreover, are subject to additional pleading requirements. A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act, the PSLRA, 15 U.S.C. 78u-4(b). Rule 9(b) requires a plaintiff to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d at 99.

The PSLRA, similarly, requires that a plaintiff specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. 15 U.S.C. 78u-4(b)(1). If an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

To state a claim under Sections 10(b) and 20(a) and

Rule 10b-5 promulgated thereunder, a plaintiff must allege that

the defendant (1) made misstatements or omissions of material

fact, (2) with scienter, (3) in connection with the purchase or

sale of securities, (4) upon which the plaintiff relied, and

(5) that the plaintiff's reliance was the proximate cause of

its injury.  *ATSI*, at 105.

Defendants have moved for dismissal of the Section

10(b) claim on the basis that Plaintiff has failed to plead

sufficient facts with respect to the following three elements:

that the identified statements were misleading; that Defendants

acted with the requisite scienter; and that the purported

misstatements caused Plaintiff's losses.  If the Section 10(b)

claim is dismissed, the 20(a) claim also fails.

A Section 10(b) plaintiff must demonstrate with

specificity why and how a statement is false.  See *Rombach v.*

*Chang*, 355 F.3d at 174.  Falsity is a failure to be truthful.

It is not a misapprehension, misunderstanding, or misstatement

of fact at the time a statement was made.  In re:  *Lululemon*

*Securities Litigation*, 14 F. Supp. 3d at 571.

The veracity of a statement or omission is measured

not by its literal truth, but by its ability to accurately

inform rather than mislead prospective buyers.  *Kleinman v.*

*Elan Corp.*, 706 F.3d at 153.  Statements that are literally

true may become misleading based upon their context and manner

of presentation.  *Id*.  Whether a statement is misleading

1    depends on the perspective of a reasonable investor.  *Omnicare,*

2    *Inc. v. Laborers District Council Construction Industry Pension*

3    *Fund*, 135 S. Ct. at 1327.

4            Plaintiff alleges that Godshall made material

5    misstatements and omissions with respect to three subjects: (1)

6    HeartWare's efforts and success in remediating the deficiencies

7    identified in the FDA Warning Letter; (2) MVAD's safety

8    profile, particularly the effectiveness of its controller and

9    the qPulse algorithm; and (3) MVAD's progress in the CE Mark

10   trial.

11           While I am not going to rule on each of the almost 50

12   alleged misstatements, and some may not constitute material

13   misstatements, I do find that there are well-pled allegations

14   relating to each of these three topics.

15           Before turning to the alleged misstatements, I want to

16   address Defendants' point about the degree to which Plaintiff

17   relies on confidential sources.  It appears that a split exists

18   in this District as to whether the use of confidential

19   witnesses to plead securities fraud cases remains viable

20   following the Supreme Court's decision in *Tellabs*.  Compare In

21   re: *MRU*, 769 F. Supp. 2d at 516, with In re: *PXRE*, 600 F. Supp.

22   2d at 526, note 18.

23           At the very least, I believe it is appropriate to rely

24   on such information where, as here, the Complaint provides a

25   plausible basis for each confidential witness' knowledge and

1    the statements attributed to the witnesses are detailed,

2    factual allegations rather than conclusory statements.  See In

3    re: PXRE, at note 18.

4         As to the first category of statements, Godshall's

5    comments relating to the efforts and success in remediating the

6    deficiencies described in the FDA warning letter, Plaintiff has

7    alleged in detail why Godshall's statements were misleading.

8    On an October 30, 2014, third-quarter earnings call, for

9    instance, Godshall made the following comment: "Most

10   importantly, we have made significant progress in our effort to

11   address the FDA warning letter issues.  The warning letter

12   remediation project is an enormous undertaking by so many of

13   our employees and impacts every aspect of our Company.  We have

14   upgraded many of our key procedures and are already seeing a

15   positive impact from the new approach.  We are working

16   diligently through issues we find, as is evidenced by our

17   battery replacement effort which began a few months ago."

18        These comments stand in contrast to Plaintiff's

19   allegations that the company failed to undertake serious

20   remediation efforts, which led to its lack of progress in

21   resolving the issues identified by the FDA.  The FDA warning

22   letter provided a non-exclusive list of violations, which

23   included: (1) failure to establish and maintain procedures for

24   implementing corrective and preventive action; (2) failure to

25   establish and maintain procedures for validating the device

---

I3GPHEAO

design; (3) failure to validate computer software for its intended use, according to an established protocol when computers or automated data processing systems are used as part of production of the quality system, as required by 21 C.F.R. 820.70(i); and (4) failure to maintain a record of the investigation by the formally designated unit when an investigation is made, as the company did not document the likely or potential root cause, or document an attempt to obtain the complete nature and details of at least ten complaints which were submitted to FDA as MDR, medical device reporting, events.

However, according to Former Employee 5, a validation and verification tester from August 2012 to March 2015 who worked on MVAD, including its controller, after receiving the FDA warning letter, the manufacturing, testing, and validation processes at HeartWare didn't change, rather, we were just doing exactly what we were doing before receiving the letter.

Former Employee 5 also explained that, when MVAD failed validation tests, supervisors simply relaxed the relevant specification to allow the device to satisfy the standard. MVAD's original specifications, for instance, called for the controller's alarm to sound at a particular decibel, which it failed to do. Rather than devise a way to increase the decibel level, the minimum standard was altered to permit the device to pass muster.

1    Furthermore, MVAD's impeller was insufficiently tested

2    as of the time of Employee 5's departure from HeartWare in

3    March of 2015.  Testing had been conducted on previous versions

4    of the impeller, and the validation and verification team had

5    access to the updated version of the impeller for only one

6    week.

7    Former Employee 4, HeartWare's program manager for FDA

8    483 warning letter remediation for non-product software from

9    March to August of 2014, further explained that adequate

10   remediation of the problems identified in the warning letter

11   would take years.  Employee 4 continued, there were tremendous

12   gaps between the R&D processes at HeartWare's headquarters

13   versus what was practiced in the manufacturing facility, which

14   was still the case when the employee left HeartWare in August

15   of 2014.

16   Moreover, the company allegedly failed to document

17   required specifications for raw materials and components

18   manufactured by third-party contractors, and failed to test and

19   audit those materials to ensure they met design requirements

20   and were suitable for the device's intended use.  This employee

21   also explained that HeartWare had no process in place for

22   auditing the software it used to test and validate its devices.

23   Employee 3, a corrective and preventative action

24   manager at HeartWare from October 2014 to July 2015, buttressed

25   these allegations, explaining that there was virtually no

1    quality assurance oversight at the company's Framingham

2    headquarters and that HeartWare failed to create and maintain

3    reliable deviation reporting, a reporting system for defects or

4    flaws in the device, notwithstanding the FDA's instruction to

5    remediate deficient corrective and preventative action

6    procedures.  When changes were made to a device, moreover,

7    HeartWare had no system in place to monitor and evaluate those

8    changes or to mandate retesting.

9         Plaintiff alleges that the failure to remediate the

10   deficiencies noted in the warning letter continued through the

11   end of the class period, i.e., the third quarter of 2015.

12        With respect to the second category of statements,

13   Godshall's comments relating to the safety profile of MVAD and

14   the effectiveness of its controller and the qPulse algorithm,

15   plaintiff has similarly satisfied its burden.

16        On the same October 30, 2014, third-quarter earnings

17   conference call, for example, Godshall stated that:  Every data

18   point we receive from bench testing, animal studies, and

19   physician commentary is that the MVAD will be

20   paradigm-changing.

21        Plaintiff has provided detailed allegations, however,

22   as to the inadequacy of both MVAD's controller and the qPulse

23   algorithm, which together rendered MVAD less safe than previous

24   ventricular assist devices.  These two features were of

25   critical importance to MVAD's functionality because the

controller contained the device's alarm system, notifying

patients and doctors when the pump created an imbalance of

pressure on the left ventricle, while qPulse allowed MVAD to

adjust its pumping speeds in an effort to reduce the frequency

of adverse events.

Employee 1, HeartWare's director of program management

from June 2008 to April 2014 and a member of HeartWare's

leadership team, reporting first to the company's chief

scientific officer, Jeff LaRose, and then to its senior vice

president for research, development, and quality, Mark Strong,

noted, for instance, the suction alarm, the algorithms, the

qPulse displays that were blank or showed gibberish, those were

problems that dogged the project throughout.  Of the problems

HeartWare had in the clinical trials, Employee 1 continued, I

haven't heard of anything that wasn't on their radar screens

early on.

With respect to the controller specifically, Employee

1 further explained that nothing really worked right.  There

were improper alarms, improper touch screen performance,

gibberish on display screens, just so many alerts and problems

and it wasn't working at all reliably. There was also a total

lack of reliability and robustness in the design of the

software to make the controller function properly.  Moreover,

there were literally more than 100 hot and critical issues

tracked on a daily basis trying to fix them when I left, and

1   that was in April of 2014.

2         Many of these issues stemmed, in the employee's

3   opinion, from management's continued use of Band-Aid solutions

4   for basic, inherent problems that no one wanted to listen to

5   early on.  Instead of doing it right, they got so far down the

6   pathway that either you take an eight-month hit to resolve the

7   issues, or you say this is the best you can do and you make it

8   acceptable.

9         Employee 5, and other HeartWare personnel, observed

10   and reported that the suction alarm on the controller was

11   defective, corroborating Employee 1's account.  MVAD's alarm,

12   according to Employee 5, would not trigger except under the

13   most extreme conditions.

14         There were also purportedly well-known flaws with

15   respect to the qPulse algorithm.  Employee 2, a senior software

16   engineer throughout the class period, for example, reported

17   that significant risks were found with the MVAD's pump pressure

18   algorithm, which was designed to reset the device if internal

19   pressure caused the pump's impeller to move too far out of

20   place.

21         Aspects of MVAD's unique design, Employee 2 explained,

22   guaranteed that the impeller would be forced out of place and

23   would strike the ends of the impeller housing, grinding blood

24   cells like a mortar and pestle, which would likely cause clots

25   and promote pump thrombosis.

1          The pump pressure algorithm was tasked with detecting

2     that we hit the end of the pump, we had a strike, and reducing

3     the pump speed because HeartWare's testing had shown that below

4     a certain speed, you could not get it to strike; so you want to

5     reduce the speed and then slowly return it to the former speed.

6          Employee 2 explained, however, that because the

7     algorithm was hastily designed, it failed to properly slow the

8     pump.  A consultant was hired to examine this issue, but when

9     the consultant discovered that the pump pressure algorithm

10    failed to prevent the impeller from grinding against the pump

11    housing, HeartWare's chief scientific officer, who reported

12    directly to Godshall, told those working on the investigation

13    to cease and desist.

14         Together, these flaws, as alleged by plaintiff,

15    painted a clear picture of a flawed product, not one that,

16    based on all data points, would be "paradigm changing" as

17    Godshall claimed.

18         I also find that Plaintiff has pled sufficient facts

19    to survive defendant's motion to dismiss with respect to the

20    final category of claims relating to the CE Mark trial.

21         On October 29, 2015, HeartWare issued a press release

22    announcing its third-quarter financial and operating results.

23    The release noted that:  We are also reviewing reported adverse

24    events, which are typical of those seen in other clinical

25    trials for ventricular assist devices, and we are confident

I3GPHEAO

that we will resolve the issue in order to resume the MVAD CE
Mark clinical trial.

          Plaintiff alleges that HeartWare knew that it was
unlikely to resume the CE Mark trial because the results to
that point were far from typical.  In particular, the 27
percent incidence rate of pump thrombosis was seven to 13 times
the rate reported in early clinical trials of competing devices
that contributed to VAD market growth, and at least three times
the rate reported in an NEJM study that had contributed to the
stagnation of the VAD market.

          Moreover, the thromboses observed in the CE Mark trial
occurred more quickly after device implantation, approximately
six times faster than reported in competing devices and more
than twice as quickly as such incidents had occurred in HVAD
patients.

          Defendants argue that Godshall's comments were not
misleading because they concerned the events being analyzed
rather than their frequency and that pump thrombosis is, in
fact, a common adverse event in VAD trials.  The disclosure
that adverse events had occurred and the description of them as
being typical, however, renders the statement objectively
misleading, given that the events had allegedly occurred with
substantial frequency and so soon after implantation.  These
purported facts also belie HeartWare's claim that it was
confident that the CE Mark trial would resume.

I3GPHEAO

1    Contrary to Defendants' arguments, moreover, none of

2    the purported misleading statements upon which I base my ruling

3    are forward looking, inactionable statements of honestly held

4    opinions or so vague as to constitute statements of corporate

5    optimism.

6    Pursuant to the PSLRA, a well-pled securities fraud

7    claim must state with particularity facts giving rise to a

8    strong inference that the defendant acted with the required

9    state of mind.  15 U.S.C. 78u-4(b)(2).  The issue is whether

10   all of the facts alleged, taken collectively, give rise to a

11   strong inference of scienter, not whether any individual

12   allegation, scrutinized in isolation, meets that standard.

13   *Tellabs, Inc. v. Makor Issues & Rights,* 551 U.S. at 322 to 23.

14   A strong inference of scienter, moreover, must be more

15   than merely plausible or reasonable.  It must be cogent and at

16   least as compelling as any opposing inference of non-fraudulent

17   intent.  *Id*. at 314.

18   In this Circuit, a strong inference of scienter can be

19   established by alleging facts to show either (1) that

20   defendants had the motive and opportunity to commit fraud, or

21   (2) strong circumstantial evidence of conscious misbehavior or

22   recklessness.  *ECA v. JP Morgan Chase Co*., 553 F.3d at 198.

23   Because I find that Plaintiff has alleged

24   circumstantial evidence of, at the very least, recklessness, I

25   need not address whether Plaintiff has sufficiently pled motive

and opportunity.  A plaintiff adequately pleads recklessness where he alleges that the defendant knew facts or had access to information contradicting its public statements; or (2) failed to review or check information that it had a duty to monitor.  See *Novak*, 216 F.3d at 308.

Plaintiff has adequately alleged scienter when all the allegations are considered, not individually but in tandem, pursuant to the Tellabs standard.  The complaint contains facts that would allow a reasonable person to infer that scienter is at least as compelling as any opposing inference.

The following factors, particularly when considered together, properly make out scienter:  First, in response to concern over rumors of adverse events in the CE Mark trial, Godshall told investors those adverse events were "typical of those seen in other clinical trials for ventricular assist devices" even though Defendants allegedly possessed data showing that MVAD was causing adverse events at a rate substantially surpassing the norm and far more quickly than was typical;

Second, MVAD's deficiencies, including defects in the controller alarm and qPulse algorithm, were allegedly repeatedly discussed at meetings attended by Godshall, including weekly MVAD meetings and monthly project oversight board meetings, reflected in meetings of minutes Godshall received, and widely reported and discussed within HeartWare,

1  even before the class period began;

2         Third, Godshall repeatedly stated that he was

3  personally focused on the details of MVAD's development and

4  commercialization, which means he either failed to perform the

5  monitoring he claimed to have performed or recklessly

6  misrepresented the circumstances to plaintiffs;

7         Fourth, many of Godshall's public statements concerned

8  issues specifically raised by the FDA in the warning letter

9  regarding a key product of the corporation, see e.g., In re:

10  *Delcath Systems, Inc. Securities Litigation*, 36 F. Supp. 3d at

11  335, which is a small company or even a medium-sized company,

12  as defendant contends, with only one manufacturing facility,

13  and thus, management's attention is less likely to be divided.

14         Finally, the magnitude of the alleged fraud here

15  further weighs in favor of a strong inference of scienter, see

16  In re: *Salix Pharm.*, 2016 WL 1629341, at 16.

17         These facts, taken together, raise a strong inference

18  that Godshall, at a bare minimum, had access to information

19  that contradicted his public statements regarding the company's

20  remediation efforts, the safety profile of MVAD, and

21  HeartWare's progress in the CE Mark Trial.

22         Finally, I must address whether plaintiff has

23  adequately pled loss causation.  Loss causation is the causal

24  link between the alleged misconduct and the economic harm

25  ultimately suffered by a plaintiff.  See *Lentell v. Merrill*

*Lynch & Co.*, 396 F.3d at 172.  This question is not meant to impose a great burden on plaintiffs.  *IBEW Local 90 v. Deutsche Bank AG*, 2013 WL 1223844 at 12.

Moreover, loss causation is subject to the less-onerous notice pleading requirements of Federal Rules of Civil Procedure 8(a)(2) in lieu of the rule 9(b) standard.  See *id.*  To establish loss causation, therefore, a plaintiff must only show that the loss was a foreseeable result of the defendant's conduct, i.e. the fraud, and that the loss was caused by the materialization of the risk concealed by the defendant's alleged fraud.  See in re:  *Vivendi, S.A. Securities Litigation*, 838 F.3d at 261.

Put more simply, proof of loss causation requires demonstrating that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.  *Id.*  It is enough, for instance, that the loss caused by the alleged fraud results from the relevant truth leaking out.  *Id.*  Indeed, when the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus.  *Id.* at 262.

Here, Plaintiff has adequately pled loss causation. Plaintiff alleges three separate events due to which it suffered losses:  First, when HeartWare's stock fell 21 percent

1   the day following the announcement of the Valtech Transaction;

2   second, when HeartWare's stock price fell approximately 30

3   percent during the trading day immediately following the

4   October 12, 2015, disclosure that defendants had observed

5   adverse events in the CE Mark Trial and would further delay

6   resumption of the trial in order to investigate; and, finally,

7   on January 11, 2016, when the value of HeartWare's stock

8   declined more than 35 percent following the announcement that

9   nearly half of the patients in the CE Mark Trial had

10  experienced pump thrombosis, that qPulse and the suction alarm

11  appeared to elevate the risk of thrombosis, and that the trial

12  would be paused indefinitely.

13          In each of these events, the market's reaction to the

14  announcement demonstrates that the "relevant truth" had, at

15  least in part, leaked out.  *Vivendi*, at 261.  Each event

16  revealed additional information about MVAD, allegedly in

17  contravention of public statements made by defendants, and

18  precipitated an immediate and marked decline in the value of

19  shares of HeartWare's stock.

20          While the connection between the alleged misstatements

21  and the Valtech transaction is perhaps more attenuated,

22  particularly in light of the admitted significance of MVAD to

23  HeartWare's future profitability and the timing of the

24  announcement of the Valtech transaction, this event suffices as

25  a basis for pleading loss causation.  Plaintiff has, thus,

1  sufficiently pled loss causation.

2          So for all of those reasons, plaintiff has

3  sufficiently pled each and every element of a section 10(b)

4  violation, and defendants' motion to dismiss is denied.

5  Because defendants' motion to dismiss with respect to the

6  control person claim under section 20(a) rests entirely upon

7  their argument that plaintiff has failed to plead the predicate

8  10(b) violation, the motion to dismiss is also denied as to the

9  section 20(a) claim against Godshall.

10          All right.  Thank you all for your patience.  I think

11  that this is more efficient to get the ruling faster.  We can

12  move forward with the case.  How long do defendants need to

13  file an answer?

14          MR. BONGIORNO:  Like 60 days, your Honor.  I have

15  discussed not the number of days but an extension with

16  plaintiff's counsel.

17          THE COURT:  That's fine.

18          MR. BONGIORNO:  And I think they're amenable.

19          THE COURT:  All right.  So we'll just make it

20  May 16th.  All right?

21          MR. BONGIORNO:  Thank you.

22          THE COURT:  Is there anything else we need to discuss

23  today?  All right.

24          MR. RIZIO-HAMILTON:  No, your Honor.

25          THE COURT:  Thank you.  I said it at the start, but I

I3GPHEAO

1    thought the advocacy on both sides was really outstanding, and

2    so I want to thank you for that.  Enjoy the weekend.

3              MR. BONGIORNO:  Thank you, your Honor.

4              MR. RIZIO-HAMILTON:  Thank you, your Honor.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25